**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David De La Rosa,<br><br>          Plaintiff,<br><br>v.<br><br>Hanger Prosthetics & Orthodics, Inc., et al.,<br><br>          Defendants. | No. CV-11-00306-PHX-DGC<br><br>**ORDER** |

Defendants Hanger Prosthetics & Orthodics, Inc., and Hanger Prosthetics & Orthodics West, Inc. (collectively "Hanger"), filed a motion for summary judgment on Plaintiff David De La Rosa's workplace discrimination and retaliation complaint. Doc. 61.  The motion has been fully briefed.  Docs. 69, 70.  For the reasons that follow, the Court will grant Defendants' motion.[1]

**I.    Background.**

Plaintiff is approximately 40 years old, of Mexican and Jewish ancestry, and Jewish in religion.  Doc. 68, ¶¶ 39-41; *see* Doc. 68-1 at 35, Dep. of David De La Rosa, at 129:19-130:9.  Plaintiff began working full time as a soft goods fitter in the Phoenix office of Hanger Prosthetics & Orthotics in August 2004.  Doc. 62, ¶ 1.  In 2007, Plaintiff began attending Arizona State University, and his then-supervisor, Brandon Dale, agreed to reduce his work hours to twenty-one hours per week and to accommodate his school

---

[1] Plaintiff's request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

schedule. *Id.*, ¶ 3. Plaintiff continued to attend school and to receive accommodated work schedules until his employment was terminated on May 15, 2010. *Id.*, ¶¶ 4, 25.

In October of 2009, Plaintiff called Hanger's 1-800 compliance hotline and reported incidents that he believed created a racist work environment. *Id.*, ¶ 5. Plaintiff reported that he had seen a mannequin with a Hitler-style mustache taped to it and posed in a Nazi salute in an area where Plaintiff normally did not work, that Brett Bostock, the supervisor who replaced Brandon Dale, referred to cleaning crews as "those Mexicans," and that Hangar had hired Mike Gardner, a person with racist tendencies. Doc. 68, ¶ 54.

Frank Bostock, the manager of Hangar's operations in Arizona and the father of Brett Bostock, met with Plaintiff about his complaints and offered several options, including transferring Plaintiff to Hanger's Glendale office managed by David McCalmont. *Id.*, ¶ 6. Plaintiff agreed to the transfer and, after taking some paid time off, began working at the Glendale location in mid-November 2009. *Id.*, ¶ 9.

While working at Hangar's Phoenix Office, Plaintiff had been one of only a few employees listed to provide "on-call" services to Phoenix Children's Hospital ("PCH"). *Id.*, ¶ 10. Plaintiff lost this extra source of work and income when he transferred to the Glendale office. *Id.*, ¶ 11. Plaintiff spoke to Mr. McCalmont about this, and Mr. McCalmont offered to add him to the Glendale on-call list. *Id.*, ¶ 13; *see* De La Rosa Depo. at 196:20-198:25 (Doc. 68-1 at 52). Plaintiff also e-mailed Mr. Bostock, saying he appreciated what Mr. Bostock had done for him and asking for additional on-call opportunities because he was not satisfied with the frequency of rotations available on the Glendale list. Doc. 62, ¶ 14. Mr. Bostock replied that the PCH on-call list was sufficiently covered, but suggested that Plaintiff ask Mr. McCalmont about providing back up coverage for other providers on the Glendale list. *Id.*, ¶¶ 14-15. Plaintiff claims that he would not have accepted transfer to the Glendale office had he known he was to be taken off the PCH on-call list, a change that resulted in a $250 loss of income per pay period. Doc. 68, ¶ 11. Plaintiff filed a charge of discrimination with the EEOC on January 12, 2010, alleging retaliation and discrimination based on national origin and

1    religion. *Id.*, ¶ 7; *see* Doc. 68-2 at 42.

2    During a six week period in March and April of 2010, while Plaintiff was working

3    at the Glendale office, Hangar received four separate complaints about Plaintiff's work

4    from co-workers and patients. *Id.*, ¶ 16. Mr. McCalmont set up a meeting to discuss

5    these incidents on May 10, 2010, at which time he presented Plaintiff with a copy of the

6    complaints. *Id.*, ¶¶ 17-18 (denied as to motivation for the meeting in Doc. 68, ¶ 17, as to

7    the accuracy of the complaints in *id.*, ¶¶ 16, 18). Cecilia Gonzales, an Employee Services

8    Field Representative, attended the meeting with Mr. McCalmont and Plaintiff. Doc. 62,

9    ¶ 19. Mr. McCalmont scheduled a follow-up meeting attended by the same parties on

10   May 14, 2010. *Id.*, ¶ 20. At both meetings, Plaintiff denied the validity of the complaints

11   against him. *Id.*, ¶ 22. Mr. McCalmont claimed that Plaintiff was belligerent,

12   disrespectful, and uncooperative, and terminated Plaintiff's employment after the meeting

13   on May 14, 2010. *Id.*, ¶¶ 21-25.

14   Plaintiff disputes that he was belligerent, and claims that the meetings and

15   complaints against him were a pretext used by Hangar to retaliate against him for his

16   workplace discrimination and retaliation complaints. Doc. 68, ¶¶ 17-23. Plaintiff filed a

17   new retaliation charge with the EEOC on May 23, 2010. Doc. 16-1 at 4.

18   Plaintiff received a dismissal and right to sue letter from the EEOC on

19   November 18, 2010, for his first discrimination and retaliation claims, and a second right

20   to sue letter on April 8, 2011, for his second retaliation claim. *Id.* at 9, 11. Plaintiff

21   timely filed suit on the first charges on February 15, 2011. Doc. 1. Plaintiff filed an

22   unopposed motion to amend the complaint to include the second retaliation claim on

23   July 7, 2011, and the amendment was allowed. Docs. 13, 15.

24   **II.    Summary Judgment Standard.**

25   A party seeking summary judgment bears the initial responsibility of informing

26   the district court of the basis for its motion, and identifying those portions of the record

27   which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*

28   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the

1    evidence, viewed in the light most favorable to the nonmoving party, shows that there is

2    no genuine dispute as to any material fact and that the movant is entitled to judgment as a

3    matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a

4    party who fails to make a showing sufficient to establish the existence of an element

5    essential to that party's case, and on which that party will bear the burden of proof at

6    trial.  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of

7    the suit will preclude the entry of summary judgment, and the disputed evidence must be

8    "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

9    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

10   **III.   Discussion.**

11          Plaintiff's first amended complaint ("complaint") alleges "racial discrimination,

12   national origin discrimination, religious discrimination, and retaliation" by Hangar in

13   violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended, and Title VII of

14   the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.  Doc. 16, ¶ 1.  The Court

15   will address Plaintiff's discrimination and retaliation claims in turn.

16          **A.     Discrimination.**

17          Title VII provides that an employer may not "discriminate against any individual

18   with respect to his compensation, terms, conditions, or privileges of employment,

19   because of such individual's race, . . . religion, . . . or national origin."  42 U.S.C.

20   § 2000e-2(a)(1).  "Similarly, § 1981 prohibits [race] discrimination in the 'benefits,

21   privileges, terms and conditions' of employment."  *Surrell v. Cal. Water Serv. Co.*, 518

22   F.3d 1097, 1103 (9th Cir. 2008) (quoting 42 U.S.C. § 1981(b)).  A plaintiff may establish

23   a violation of Title VII or § 1981 by proving that discrimination created a hostile work

24   environment.  *See e.g. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (Title

25   VII); *Manatt v. Bank of America, NA*, 339 F.3d 840, 797, 797 (9th Cir. 2003) (§ 1981).

26          To prevail on his hostile work environment claim, Plaintiff must show (1) that he

27   was subjected to verbal or physical conduct because of his national origin, race, or

28   religion; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently

severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (internal quotations omitted); *Gregory v. Widnall*, 153 F. 3d 1071, 1074 (9th Cir. 1998).

To determine whether conduct was sufficiently severe or pervasive to violate Title VII, courts look at all the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see Oncale v. Sundowner Offshore Serv's*, 523 U.S. 75, 81 (1998); *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2004), 349 F.3d at 642.  The same analysis applies to race-based claims under 42 U.S.C. § 1981.  *Manatt*, 339 F.3d 840 at 797.  "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872 (9th Cir 2001) (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).  Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.*

The Court's analysis in this case is made unnecessarily burdensome by the fact that Plaintiff has alleged three forms of discrimination – race, national origin, and religion – but fails anywhere in his complaint and responsive pleadings to provide an articulated basis for any one of these claims.  The Court is simply left to guess at which factual allegations go with which claims.  This process is made even more difficult by the fact that the number of distinct claims is potentially unwieldy: racial discrimination (Mexican), racial discrimination (Jewish), national origin discrimination (Mexican), national origin discrimination (Jewish), and religious discrimination (Jewish).   In addition, Plaintiff makes allegations in his complaint and numerous assertions in his statement of facts and deposition that relate to discriminatory conduct towards

individuals of other races, including racial discrimination toward African Americans based on the fact that Plaintiff has an adopted daughter who is partially African American.[2]  The Court will organize its discussion of Plaintiff's claims into those based on racial discrimination (Mexican) and racial and religious discrimination (Jewish).[3]

### 1.    Racial Discrimination (Mexican).

The complaint alleges that one of Hanger's employees "made a series of highly offensive comments in the workplace regarding Mexicans and Mexican Americans." *Id.*,¶ 14.  In support, Plaintiff cites to his own deposition testimony that he heard Brett Bostock once or twice derogatorily refer to cleaning crews as "those Mexicans." Doc. 68, ¶ 55, Doc. 68-1 at 56, Dep. of David De La Rosa, at 216:5-17, 18-23.

The complaint also alleges that Hanger "sometimes reprimanded their Hispanic employees for speaking Spanish at work" even though speaking Spanish had no negative impact on Hanger's legitimate business interests.  Doc. 16, ¶ 11.  Plaintiff cites to his own deposition in which he testified that two sisters who worked in the hospital department "were told they could not speak Spanish anymore."  Doc. 68, ¶ 57.  Doc. 68-1 at 56, Dep. of David De La Rosa, at 216:18-23.  Plaintiff did not know who told them this or when the alleged incident took place.  Doc. 68-1 at 56-57, Dep. of David De La Rosa, at 216:18-23; 217:23-25.

---

[2] Plaintiff cites to a portion of his deposition in which he claims to have taken offence upon overhearing Hanger supervisor Brett Bostock comment on an African American co-worker's hair, "What's up with the greasy black girl look?"  Doc. 68, ¶ 59; *see* Doc. 68-1 at 42-43, David De La Rosa Dep. 138-139.

[3] The Court finds that race is a more appropriate basis for Plaintiff's claims than national origin because Plaintiff asserts that he is of Mexican and Jewish ancestry (Doc. 16, ¶ 5; *see* Doc. 68-1 at 35, Dep. of David De La Rosa, 129:19-130:9) and this is a racial designation. *See, e.g., Saint Francis College v. Al-Kharzraji*, 481 U.S. 604, 613 (1987) (equating ancestry and ethnic characteristics with race for purposes of § 1981); *Vasquez*, 349 F.3d at 642, n. 20 (9th Cir. 2004) (stating that a plaintiff's Title VII national origin discrimination claim based on being Hispanic "is actually a race based claim."). The fact that Plaintiff designated his claims as national origin rather than race in his charge sheet filed with the EEOC is of little consequence because the allegations supporting Plaintiff's claims are the same and the Court may consider "any charges of discrimination that are like or reasonably related to the allegations made in the EEOC charge." *Deppe v. United Airlines*, 217 F.3d 1262, 1267 (9th Cir. 2000) (internal quotations and citations omitted).

- 6 -

Plaintiff also points to his deposition testimony regarding the manager at a doctor's office where he made calls for Hanger who "made a bunch of racist comments" and had a "racist lingo."  Doc. 68-1 at 42-43, Dep. of David De La Rosa, at 159:2-163:5. Plaintiff testified that he complained about the office manager's conduct to Brett Bostock, but he could not remember any exact statements he reported.  *Id.* at 161:16-17. He recounts generally reporting that "she used the N word" and "she had no problem saying kike."  *Id.* at 161:22-24.

Plaintiff complains that Hanger hired an individual, Mike Gardner, despite the fact that two Hanger employees had heard him make racist remarks about African-Americans, and, once hired, Mr. Gardner made racist remarks about African-Americans, Hispanics, and Jews.  Doc. 69 at 12; *see* Doc. 68, ¶¶ 54, 101, 102, 109.  Plaintiff points to the deposition testimony of one witness who heard Mr. Gardner make negative remarks about blacks, including that black people should not be president, and remarks about Hispanics being lazy and on the welfare system.  Doc. 68-2, Dep. of William Yule, 16: 4-16; 19:14-23.  Plaintiff cites another witness who testified that Mr. Gardner pointed to her Jewish necklace and said "We don't like your kind."  Doc. 68-2, Dep. of Gretchen Wellman, 17:21-25.

Taking into account the totality of this evidence, the Court finds that Plaintiff has failed to establish that Hanger subjected him to a hostile work environment based on his Mexican race.  Most of Plaintiff's factual assertions fail to establish the first element of a hostile workplace claim – that Plaintiff was subjected to discriminatory conduct.

Plaintiff's assertion of Spanish language restrictions is based entirely on Plaintiff's account of third-party statements.  It fails to provide evidence of what was said and by whom, from which a jury could reasonably conclude that Hanger subjected employees to language restrictions or did so apart from any legitimate business interest.[4]   More

---

[4] The EEOC's compliance manual states that "Title VII permits employers to adopt English-only rules under certain circumstances."  *EEOC Compliance Manual Sec. 13-V*, EEOCCM § 13-V, 2006 WL 4673359, § 13-V(1).

fundamentally, Plaintiff does not point to any evidence that he was adversely affected by this alleged incident or that he was subjected to language restrictions.

Similarly, evidence that Brett Bostock referred to cleaning crews as "those Mexicans," coupled with Plaintiff's vague assertions about a non-Hanger office manager's "racist lingo," and the testimony of other employees about Mike Gardner's racist comments made outside of Plaintiff's presence, do not provide evidence of any verbal conduct directed at Plaintiff.

In *Manatt*, the Ninth Circuit discounted a Chinese plaintiff's accounts of frequently overheard jokes about Chinese people and her co-workers' mocking references to "China man" and "communists from Beijing" as "simple teasing" and "offhand comments." 339 F.3d at 798. The Court of Appeals focused its analysis on the few incidents in which employees "direct[ed] their racially insensitive 'humor' at Manatt." *Id*. Plaintiff has provided even less evidence. In *Manatt*, the plaintiff frequently overheard jokes that were derogatory toward her race. *Id.* at 795. The only statements Plaintiff personally overheard were "once or twice" when Brett Bostock referred to cleaning crews as "those Mexicans." Doc. 68-1 at 56, Dep. of David De La Rosa, at 216:5-17.

This evidence falls far short of proving Plaintiff's allegation that one of Hanger's employees "made a series of highly offensive comments in the workplace regarding Mexicans and Mexican Americans." Doc. 16,¶ 14. Even if these overheard comments provide some evidence of conduct offensive toward Plaintiff as an individual, they are like the isolated, off-hand comments discussed in *Manatt* and are not "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment." *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 817 (9th Cir. 2002)

### 2.    Racial and Religious Discrimination (Jewish).

Plaintiff presents testimony in his deposition that he saw a mannequin with a Hitler-style mustache taped to it and its arm raised in a Nazi-style salute in the hospital department where he occasionally had reason to go. Doc. 68-1 at 39-41, Dep. of David

De La Rosa, at 146:1-154:4.  Plaintiff testified that he took strong offense because his mother is from Germany and his Jewish family was very affected by Hitler and the Holocaust.  *Id.* at 146:23-147:6.  Plaintiff testified that he saw the mannequin so posed a couple of times, all in the same day.  *Id.* at 147:18-22; 153:17-154:4.  Plaintiff's testimony is corroborated by Gretchen Wellman, another Jewish employee, who saw the mannequin and saw Brett Bostock laugh at it and raise the arm into a Nazi salute.  Doc. 68-2 at 24-25, Dep. of Gretchen Wellman, 10:23-15:16.  Plaintiff presents additional testimony that on one occasion, when the Star of David necklace he usually wore became visible outside of his shirt, Brett Bostock "looked at it distinctfully" and "screwed up his face" and said, "Oh, that's gaudy."  Doc. 68-1 at 36, Dep. of David De La Rosa, at 134:11-135:10.

The mannequin incident, even if not specifically directed at Plaintiff, presents evidence that Plaintiff was subjected to conduct particularly offensive to someone of Jewish ancestry.  Plaintiff also presents facts showing that the conduct was unwelcome.  Plaintiff testified in his deposition that he put the arm down on the mannequin and "didn't want to see it anymore" because "something like that destroyed my family.  Something like that did terrible things."  Doc. 68-1 at 40, Dep. of David De La Rosa, at 150:3-4.  The remaining question is whether this conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.

The offensive display of the mannequin during one day was a singular rather than repeated occurrence.  In *Manatt*, the Ninth Circuit was "certainly troubled" by two instances of racially-offensive conduct, including offensive gestures and verbal ridicule directed at Manatt, and recognized that "these events caused Manatt to suffer pain."  339 F.3d at 799.  The Court of Appeals acknowledged that "[i]f these actions had occurred repeatedly, Manatt may very well have had an actionable hostile environment claim."  *Id.*  But the court concluded that "two regrettable incidents occurring over a span of two-and-a-half years, coupled with the other offhand remarks made by Manatt's co-workers and supervisor, did not alter the conditions of Manatt's employment."  *Id.*

The conduct complained of in this case is less direct and personalized than the incidents the Ninth Circuit found insufficient in *Manatt*. The two incidents in *Manatt* were directed at the plaintiff and distinctly mocked her Chinese race and characteristics. First, when co-workers saw that Manatt had overheard them laughing and saying "China man," they began pulling back the corners of their eyes to mock the appearance of Asians. *Id.* at 795. Second, co-workers mocked Manatt's pronunciation of the word "Lima;" then, one of them placed a call to an employee in Peru and yelled "China woman, China woman, China woman, get your butt over here," and had her pronounce the word over the phone. *Id.* The co-workers continued to mock Manatt's pronunciation and to say it was "because she's a China woman." *Id.* at 795-96.

Plaintiff presents no evidence that the offensively posed mannequin was directed at him, and his encounter with the mannequin does not match the frequency or severity of the two personalized attacks found insufficient to support a hostile work environment claim in *Manatt*. Other cases in this circuit are in accord. *See Vasquez*, 349 F.3d at 643-44 (finding no hostile work environment where a supervisor made direct, racially-offensive statements to a plaintiff on two occasions six months apart); *c.f. Draper v. Coeur Rochester, Inc.*, 147 f.3d 1104, 1108 (9th Cir. 1998) (finding hostile work environment where plaintiff's supervisor made frequent sexual remarks toward plaintiff over a two year period); *Kang*, 296 F.3d at 814, 817 (9th Cir. 2002); (finding sufficient evidence of hostile work environment where plaintiff experienced daily verbal abuse and multiple incidents of physical abuse.).

The incident involving Plaintiff's Star of David necklace adds little weight to Plaintiff's claim. Plaintiff has presented no evidence that the statement "Oh, that's gaudy" was directed at anything other than the physical appearance of the necklace. Gretchen Wellman's testimony that Mr. Gardner pointed to a Jewish necklace she wore and said "We don't like your kind" also does not alter the Court's conclusion because Plaintiff presents no evidence that he heard or was even aware of this statement.

Plaintiff argues that the Court should take into account the cumulative effect of all

of his discrimination claims and not segregate its analysis by type of claim.  Doc. 69 at 11.[5]  The Court has already aggregated Plaintiff's claims based on Jewish ancestry and Jewish religion because they are factually indistinguishable.  Even if the Court were to consider all the instances of harassment based on Plaintiff's Mexican ancestry, this would not add significantly to the total effect of the discriminatory conduct directed at Plaintiff.  As the Court's analysis of those instances above makes clear, such an approach would, at most, result in the addition of only a few isolated incidents of offhand comments not directed toward Plaintiff.  In sum, Plaintiff has failed to create an issue of material fact that he was subjected to discriminatory conduct sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.  The Court accordingly will grant summary judgment to Defendants on Plaintiff's discrimination claims.

## B.    Retaliation.

A plaintiff makes a prima facie case of unlawful retaliation by producing evidence that he engaged in activity protected by Title VII, that the employer subjected him to a materially adverse action, and that there was a causal link between the protected activity and the adverse action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2004); *Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  The Ninth Circuit "has explained that . . . 'the requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does

---

[5] Plaintiff bases this argument on the Ninth Circuit's finding in *Lam v. University of Hawaii*, 40 F. 3d 1551, 1552 (9th Cir. 1994), that it was error for the district court to bisect its analysis according to a plaintiff's sex and race.  Doc. 69 at 11.  But as Hanger points out, *Lam* was a disparate impact case that looked at whether an adverse hiring decision involving an Asian female was the product of discrimination, not at whether a plaintiff had proven separate theories of a hostile workplace claim.  *See* Doc. 70 at 3.  Plaintiff also relies on the Sixth Circuit's decision in *Hafford v. Seidner*, 183 F. 3d 506, 515 (6th Cir. 1999), which noted that it was difficult to segregate a plaintiff's discrimination claims on the basis of his being a black Muslim because some instances of discrimination linked these two traits. *Id.*  Plaintiff has not presented evidence of incidents directed at both his Mexican and Jewish ancestry.

not even need to rise to the level of a preponderance of the evidence.'" *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061-62 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)); *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (same).

If the plaintiff presents a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse employment action. *See Brooks*, 229 F.3d at 928. If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Id*. The plaintiff may do so by presenting either direct evidence or specific and substantial circumstantial evidence that the defendant's reason was a pretext for retaliation. *See Villiarimo*, 281 F.3d at 1062; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

The complaint alleges that after Plaintiff complained about the discriminatory work environment at Hanger, Hanger took a number of actions that constituted a "pattern of retaliation" against him. Doc. 16, ¶¶ 16-17. These include that Hanger supervisors told Plaintiff if he did not like the work environment he could either quit or be transferred; after Plaintiff was transferred, some of his work duties and compensation were taken away; hair was placed in Plaintiff's lunch at work; Plaintiff was subjected to increased surveillance and unfair performance reviews; and Hangar terminated Plaintiff's employment based on false accusations of misconduct. *Id.*, ¶¶ 19-21; 23-24.

Hanger does not dispute that Plaintiff engaged in protected activity when he complained about discriminatory conduct by calling Hanger's compliance hotline, speaking to Frank Bostock, and filing charges with the EEOC. Hangar's arguments center instead on Plaintiff's failure to show adverse employment actions that are causally linked to Plaintiff's complaints. Doc. 61 at 14.

As with his discrimination claims, Plaintiff fails to provide an articulated basis for each of the retaliation claims alleged in the complaint. His response to the summary judgment motion directly addresses only two bases for retaliation – Plaintiff's loss of on-

call pay and his termination.  Doc. 69 at 14.  Of these, Plaintiff attempts to show a causal link only to his termination.  *Id.* at 14-17.  The Court is not required to construct arguments or locate evidence for Plaintiff.  *Carmen v. S.F. Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir.2001); *see also Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact").  As a result, the Court will address the causal nexus only for his termination.

Plaintiff's theory of retaliatory discharge is based on the fact that his protected communications included complaints about Mr. Bostock's son, and an assertion that Mr. McCalmont – the sole decision-maker in Plaintiff's termination – conspired with Mr. Bostock to terminate Plaintiff in retaliation.  Doc. 68, ¶¶ 62, 85.  This theory is based entirely on speculation.  The fact that Mr. McCalmont was a friend of a superior who may have had a reason to retaliate against Plaintiff for his complaints is not sufficient to show a causal link between those complaints and Mr. McCalmont's actions.  Plaintiff has had the opportunity for full discovery, and beyond his own deposition testimony asserting that it is was "common knowledge" that Mr. Bostock and Mr. McCalmont were "great friends" and part of an "old regime" (*see* Doc. 68-1 at 70, Dep. of David De La Rosa, at 272:15-25), he has produced no evidence from which a jury could infer that Mr. Bostock influenced or was in any way involved in Mr. McCalmont's decision to terminate Plaintiff.

Plaintiff attempts to show that Mr. McCalmont was aware of the substance of his discrimination complaints through Mr. Bostock.  He points to evidence that Mr. Bostock remained in contact with Mr. McCalmont about Plaintiff's progress after his transfer to the Glendale office.  Doc. 69, ¶ 7.  This evidence includes an email from Mr. Bostock to Plaintiff following his transfer stating: "I have stayed in contact with David McCalmont and he has indicated that you seem to be happy working with him and his staff" (Doc. 68-2 at 36), and Plaintiff's testimony that Mr. McCalmont told him he was communicating regularly with Mr. Bostock regarding Plaintiff and his job performance (Doc. 68-1 at 71,

Dep. of David De La Rosa, at 273:7-11).  But this evidence does not show that Mr. Bostock held a grudge against Plaintiff for complaining about his son or that he ever communicated anything to Mr. McCalmont about Plaintiff's complaints.

Plaintiff also cites to his deposition testimony in which he claims to have told Mr. McCalmont about his discrimination complaints (Doc. 68, ¶ 7), but the testimony Plaintiff cites does not support this assertion.  Plaintiff testified that he "believe[d]" he spoke to Mr. McCalmont about the mannequin incident, but he does not remember when and does not "have a lot of recollection" about the conversation.  Doc. 68-1 at 54-55, Dep. of David De La Rosa, at 208:5-209:16.

Plaintiff argues that Mr. McCalmont admitted in his warning letter before the termination that he knew Plaintiff had made a discrimination complaint against Hanger.  Doc. 68, ¶ 7.  But the letter indicates only that Plaintiff accused Mr. McCalmont of retaliation during the first meeting Mr. McCalmont held to discuss the four complaints about Plaintiff's work performance.  In relevant part, the letter states,

> Rather than participate in a solution-focused discussion of what you can do to address and correct how you interact with others, you became belligerent and rejected my legitimate comments, labeling my efforts as some kind of reaction to a discrimination complaint that you have against Hanger.  I am not involved in that matter.

Doc. 68-2 at 39-40.  This statement, made in response to Plaintiff's accusation, does not show that Mr. McCalmont had prior knowledge of Plaintiff's discrimination complaints or had any reason to retaliate against Plaintiff for making them.  Any knowledge Plaintiff may have imparted to Mr. McCalmont in the form of accusations at the first meeting occurred after Mr. McCalmont had received the complaints that Plaintiff claims were trumped up as a reason to terminate him.  Plaintiff's theory simply does not work.  If Mr. McCalmont learned about Plaintiff's protected conduct from Plaintiff at their first meeting to address the complaints, then the complaints could not have been instigated by McCalmont in retaliation for the protected activity as Plaintiff alleges.

- 14 -

1    Plaintiff makes a final argument that his termination is per se grounds for a prima

2    facie case of retaliation because it took place less than four months after Plaintiff filed his

3    charge of discrimination with the EEOC.  Doc. 69 at 17.  Plaintiff relies on *Coszalter v.*

4    *City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003), which states that, "[d]epending on the

5    circumstances, three to eight months is easily within a time range that can support an

6    inference of retaliation."  But *Coszalter* did not hold, as Plaintiff argues, that temporal

7    proximity is a per se ground for a prima facie case of retaliation.  In fact, the court

8    proceeded to caution that "[a] rule that any period over a certain time is per se too long

9    (or, conversely, a rule that any period under a certain time is per se short enough) would

10   be unrealistically simplistic."  *Id.* at 977-78.

11   The Ninth Circuit has stated that "in some cases, causation can be inferred from

12   timing alone" if the alleged retaliation follows "on the heels of protected activity."

13   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).  But cases that

14   have found a period of months between protected activity and alleged retaliation

15   sufficient for a prima facie case have, at a minimum, relied on an additional showing of

16   knowledge of, or some kind of involvement in, the protected activity on the part of the

17   decision-maker.  *See, e.g.*, *Miller v. Fairchild Indus. Inc.*, 797 F.2d 727, (9th Cir. 1986)

18   (finding evidence that management personnel responsible for layoffs had also

19   participated in EEOC negotiations and knew of the plaintiffs' protected activity less than

20   two months earlier was "sufficiently probative . . . to establish a prima facie case");

21   *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (inferring causation where

22   adverse employment actions took place less than three months after Yartzoff's complaint

23   where his supervisors were aware of his Title VII charges and his participation in

24   administrative investigations); *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859,

25   869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within

26   months of protected activity where supervisor told employee he knew of her complaint

27

28

- 15 -

and that it "would not be in her best interests" for her to file a discrimination charge).[6] Conversely, the Ninth Circuit has stated that lack of knowledge of a plaintiff's protected activity on the part of the decision-maker "breaks the requisite causal link." *Cohen*, 686 F.2d at 797.

Here, Plaintiff provides no evidence beyond speculation that Mr. McCalmont knew of Plaintiff's protected activity when events allegedly were set in motion to terminate him. The fact that Plaintiff complained about Mr. Bostock's son and Mr. Bostock communicated with Mr. McCalmont about Plaintiff's welfare after the transfer is simply insufficient to show that Mr. Bostock told Mr. McCalmont of Plaintiff's protected activity or conspired with McCalmont to retaliate against Plaintiff. Mr. McCalmont testified that he was not involved in the events leading up to Plaintiff's transfer and was not provided details about the circumstances surrounding that request. Doc. 62-2 at 2, ¶ 3. Plaintiff provides no evidence to the contrary. Plaintiff's testimony that he "believed" he told Mr. McCalmont about the mannequin incident is not sufficient to create a genuine issue of fact for trial. And the fact that Plaintiff claimed retaliation in his first meeting with McCalmont to discuss complaints does not show that McCalmont had knowledge of Plaintiff's protected activity when, under Plaintiff's theory, the complaints were trumped up to provide a pretext for his termination.

Plaintiff has failed to present evidence from which a reasonable jury could conclude that McCalmont knew of his protected activity. *Anderson,* 477 U.S. at 248. Because a decision-maker's lack of knowledge about protected activity "breaks the requisite causal link," *Cohen*, 686 F.2d at 797, the Court will grant summary judgment to Defendants on Plaintiff's retaliation claims.

**IT IS ORDERED:**

1.     Defendants' motion for summary judgment (Doc. 61) is **granted**.

---

[6] *Strother* involved charges brought under California law, but the same three-pronged requirement for showing a prima facie case of retaliation under Title VII applied. 79 F.3d 859 at 868.

2.      The Clerk shall terminate this action.

Dated this 4th day of September, 2012.

David G. Campbell
United States District Judge